**Martha G. DRAKE, Rodney A. Bailey, Robert A. Asperger, John R. Newhouse, Betty L. Newhouse, Stephen D. Webster, Anabelle C. Smith, Helen M. LeTarte, Plaintiffs,**

v.

**The DETROIT EDISON COMPANY, Northern Michigan Electric Cooperative, Inc., Wolverine Electric Cooperative, Inc., and the United States Nuclear Regulatory Commission, Defendants.**

No. G77–364 C.A.

United States District Court,
W. D. Michigan, S. D.

June 26, 1978.

Martha G. Drake in pro per.

Warner, Norcross & Judd, Grand Rapids, Mich., John D. Tully, Grand Rapids, Mich., of counsel, for defendants Det. Ed., N. Mich. Elec., Wol. Elec. & Nat. Rural Util. Coop.

James S. Brady, U.S. Atty., Grand Rapids, Mich., Stephen S. Ostrach, Stephen F. Eilperin, Sol., Mark E. Chopko, Washington, D.C., for U.S. Nuclear Reg. Comm.

## OPINION

FOX, Chief Judge.

■ This matter has been renewed following a determination by the Nuclear Regulatory Commission (NRC) that institution of agency proceedings against defendants, as requested by plaintiffs pursuant to 10 CFR § 2.206, was not appropriate. I stayed this case on January 19, 1978 pending action by the NRC. In light of the NRC's determination it is now proper to remove the stay and proceed.[1]

---

1. After this opinion was substantially completed defendants filed renewed motions to dismiss. All defendants have contended that this court now lacks jurisdiction, if it had jurisdiction at all, since the Commission's decision in the section 2.206 action is a final order, reviewable only in the Court of Appeals. The Nuclear Regulatory Commission argues that plaintiffs have failed to state a claim against it upon which relief can be granted insofar as there has been no showing that the agency abused its discretion in failing to suspend or revoke the Fermi 2 construction permit. I will deal with the first point here, and make reference to the second in text, infra.

With respect to the claim that this court has never properly had jurisdiction over this matter owing to the fact that no private cause of action should be implied under the Atomic Energy Act, it must be said that the argument comes too late. I have already held that such actions are permissible, and while the briefs on the point would have been helpful had they been before me prior to that decision, they nevertheless fail to persuade me that an implied cause of action does not exist. To the extent it is suggested that the nature of the interest asserted is significant, I agree. That factor is properly considered under the doctrine of standing, however, and not under the rubric of private cause of action. See text, infra. Moreover, the existence vel non of a private cause of action is irrelevant to the issue of the propriety of plaintiffs' claims against the Commission or this court's jurisdiction over them. Even were a private action not implied under the Act, the complaint would perforce be dismissed only against the defendants other than the Commission. This court's jurisdiction over claims against an administrative agency arises under section 10 of the Administrative Procedure Act, 5 U.S.C. §§ 701 et seq., and is independent of any cause of action, express or implied, provided for in substantive federal legislation. See discussion in text at p. 1131, infra.

The Commission further argues that even if this court had initial jurisdiction, it has lost that jurisdiction in light of the agency's action on the section 2.206 request. After determining that a private cause of action may be implied under the Atomic Energy Act, I stayed further action by this court in January pending the Commission's decision regarding the section 2.206 request. My decision was based on the doctrine of primary jurisdiction, which dictates that a court should defer to an administrative agency's expertise in matters such as

Before considering the merits of plaintiffs' motion for preliminary injunction it is necessary to decide whether plaintiffs have standing to bring this action. It has been noted that "[t]he rules of standing . . . are threshold determinants of the propriety of judicial intervention." *Warth v. Seldin,* 422 U.S. 490, 517–18, 95 S.Ct. 2197, 2215, 45 L.Ed.2d 343 (1975). *See Santos v. District Council of New York City, etc.,* 547 F.2d 197, 199 (2d Cir. 1977). Consideration of the standing issue at this juncture is the next logical step following my opinion earlier this year recognizing a private cause of action under the Atomic Energy Act. *Drake v. Detroit Edison Co.,* 443 F.Supp. 833 (W.D.Mich.1978). While I noted there that the concept of standing is analogous to the factors involved in implying a private cause of action, *id.* at 838–39, and the Supreme Court has observed that the two concepts frequently overlap, *National R.R. Passenger Corp. v. National Ass'n of R.R. Passengers,* 414 U.S. 453, 456, 94 S.Ct. 690, 38 L.Ed.2d 646 (1974), they are, nonetheless, distinct issues. Insofar as "it is only if . . . a right of action exists that we need consider whether . . . [a party] had standing to bring the action . . . .," *National R.R. Passenger Corp., supra,* at 456, 94 S.Ct. 690, 692, 38 L.Ed.2d 646, the cause of action question should be analyzed first, to be succeeded by examination of the separate issue of standing only if a private cause of action is deemed available under the relevant statute.

In order to have standing to bring any action a plaintiff must satisfy a two-pronged test established by the Supreme Court in *Association of Data Processing Service Organizations, Inc. v. Camp,* 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970). First, plaintiff must show that he has suffered an injury in fact. Second, it must be demonstrated that the interests allegedly damaged are arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question. Plaintiffs here have alleged a sufficient injury in fact by claiming that as members of the purchasing cooperatives their utility rates will increase owing to the interest payable by the cooperatives on the loans they received to cover the cost of the purchase of their 20 percent ownership interest in Fermi 2. The so-called "zone of interests" test, however, presents more substantial problems.

I pointed out in my previous opinion that a court must look to considerations in determining whether a plaintiff is a member of the class for whose especial benefit the statute in question was enacted— one of the factors deemed relevant in deciding whether a private cause of action may be implied—that are similar to the ones involved in determining whether a plaintiff has satisfied the zone of interests test for standing purposes. The tests are not identical, however. While it is necessary with respect to the cause of action issue to determine whether a plaintiff *possesses* interests sought to be protected by particular legislation, the second part of the standing test imposes upon a plaintiff the requisite that he actually *assert* interests that are arguably within the zone of interests to be protected by the relevant statute. Although

this. That doctrine comes into play, however, only after it is determined that the claim "is originally cognizable in the courts . . .; in such a case the judicial process is *suspended* pending referral of . . . [certain] issues to the administrative body for its views." *United States v. Western Pac. R.R. Co.,* 352 U.S. 59, 63–64, 77 S.Ct. 161, 165, 1 L.Ed.2d 126 (1956) (emphasis added).

It is clear that the primary jurisdiction doctrine is not intended to divest the court in which the case was originally brought of jurisdiction, even when decisions of the agency are reviewable only in the Courts of Appeals. If a private cause of action exists, a party may seek reme-

dies in the courts, which provide in such circumstances not "another level of review into an already lengthy process" as the Commission contends (NRC's Renewed Motion to Dismiss, at 13), but an alternative to administrative proceedings that frequently do not provide as broad a spectrum of remedies as are available in the courts. When a judge defers to the expertise of a regulatory agency under primary jurisdiction he acts in his sound discretion in order to reach a just result in the case pending, and it has never been contemplated that in so doing he runs the risk of somehow losing jurisdiction.

this distinction was clearly contemplated in *Data Processing,* in the companion case of *Barlow v. Collins,* 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970), the Court appeared to retreat from that position with their grant of standing to plaintiffs who themselves were within the intended scope of protection of the statute. This implication that possession, rather than assertion, of protected interests was sufficient has been called "inadvertent," *see* Davis, *The Liberalized Law of Standing,* 36 U.Chi.L.Rev. 450, 456 (1970), and, indeed, the Court has consistently cited the *Data Processing* test in subsequent opinions.

Notwithstanding its references to the zone of interests test, in none of the more than twenty cases since 1970 in which standing was in question has the court applied the test. It has dealt instead exclusively with the threshold issue of injury in fact. The Court's neglect of the zone of interests test has prompted some scholars to conclude that the test has become extinct, *see* K. Davis, *Administrative Law of the Seventies* § 22.00–7 (Supp.1977); Sedler, *Standing, Justiciability and All That: A Behavioral Analysis,* 25 Vand.L.Rev. 479, 486–87 (1972), and a majority of lower courts merely to pay lip service to the test without scrutinizing the facts to determine whether or not sufficient interests are involved. *See, e.g., Florida v. Weinberger,* 492 F.2d 488 (5th Cir. 1974); *Merriam v. Kunzig,* 476 F.2d 1233 (3d Cir. 1973); *Park View Heights Corp. v. City of Black Jack,* 467 F.2d 1208 (8th Cir. 1972); *Civiles de Centroamerica v. Hannah,* 148 U.S.App.D.C. 159, 459 F.2d 1183 (1972); *Tax Analysts and Advocates v. Shultz,* 376 F.Supp. 889 (D.D. C.1974). Yet, despite its failure to rely on the zone of interests test, the Supreme Court has continued to recognize its viability. In some cases reference to the test has been explicit. *See Simon v. Eastern Ky. Welfare Rights Org.,* 426 U.S. 26, 39 n.19, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976); *Sierra Club v. Morton,* 405 U.S. 727, 733 n.5, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). In *United States v. SCRAP,* 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973), the Court was faced with a situation similar to that

present in this case: plaintiffs alleged injury to economic interests, *inter alia,* resulting from defendants' violation of a federal statute, there the National Environmental Policy Act (NEPA), here the Atomic Energy Act. Mr. Justice Stewart, speaking for five members of the Court, observed that "it is unnecessary to reach any question concerning the scope of the 'zone of interests' test or its application to this case. It is undisputed that the 'environmental interest' that the appellees seek to protect is within the interests to be protected by NEPA, and it is unnecessary to consider the various allegations of economic harm on which the appellees also relied in their pleadings and which the Government contested are outside the intended purposes of NEPA." *Id.* at 687 n.13, 93 S.Ct. 2405, 2415, 37 L.Ed.2d 254.

 In other opinions the words "zone of interests" are absent, yet it remains clear that the Court has not abandoned the concept. First of all, as noted above, each of the cases dealing with the standing issue refers to *Data Processing, supra,* as a starting point for analysis. Second, while the zone of interests test may not be discussed explicitly, the fundamentals thereof have been set forth, albeit by a somewhat different approach. The Court has frequently addressed standing questions in terms of constitutional limitations on federal court jurisdiction and prudential limitations on its exercise. *See, e.g., Arlington Heights v. Metropolitan Housing Corp.,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977); *Singleton v. Wulff,* 428 U.S. 106, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976); *Warth v. Seldin,* 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). There is no doubt that the *Data Processing* injury in fact test corresponds with the minimum constitutional mandate that a case or controversy exist. In order to invoke federal court jurisdiction a plaintiff must show that he himself has suffered "some threatened or actual injury resulting from the putatively illegal action. . . ." *Linda R. S. v. Richard D.,* 410 U.S. 614, 617, 93 S.Ct. 1146, 1148, 35 L.Ed.2d 536 (1973). It appears equally clear, more-

over, that the zone of interests test was created to be, and remains, one of the prudential considerations that, "apart from Act III's minimum requirements, serve to limit the role of the courts in resolving public disputes." *Warth, supra,* 422 U.S. at 500, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343. It has been stated, for example, that "the source of the plaintiff's claim to relief assumes critical importance with respect to the prudential rules of standing . . . [and] the standing question in such cases is whether the constitutional or statutory provision on which the claim rests properly can be understood as granting persons in the plaintiff's position a right to judicial relief." *Id.* See *Singleton, supra,* 428 U.S. at 113–14, 96 S.Ct. 2868, 49 L.Ed.2d 826. This language, although different from that in *Data Processing,* requires a court to make the same type of inquiry that Justice Douglas deemed important in that case: does the statute under which plaintiff is seeking relief permit recovery for the kind of injury allegedly suffered?

 It is true that in a number of cases the Court has granted standing to a plaintiff who could not have been said to assert personal interests within the zone. See *Craig v. Boren,* 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976); *Singleton v. Wulff,* 428 U.S. 106, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976); *Planned Parenthood of Central Missouri v. Danforth,* 428 U.S. 52, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976); *Doe v. Bolton,* 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973); *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); *Eisenstadt v. Baird,* 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972). These cases do not serve to indicate, however, that the Court has eschewed the zone of interests test. In each the plaintiff alleged injury not only to himself but to third parties whose asserted interests clearly fell within the zone of interests intended to be protected by the relevant constitutional or statutory provision. The Court's primary effort with respect to the standing question in these cases, therefore, was directed at de-

termining whether the doctrine of *jus tertii*[2] permitted a plaintiff to assert the rights of third parties. Recognized as a "countervailing consideration [that] may outweigh the concerns underlying the usual reluctance to exert judicial power when the plaintiff's claim to relief rests on the legal rights of third parties," *Warth, supra,* 428 U.S. at 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343, *jus tertii* analysis requires an examination of the relationship of the litigant to the person whose rights he seeks to protect and the ability of the third party to assert his own right. There is no suggestion in any of the *jus tertii* cases that the basic standing requirements are inapplicable. Thus, the plaintiff must always meet the constitutional injury in fact test by alleging a personal stake in the outcome of the controversy. Additionally, he must allege concrete injury to the third party, and, it seems clear, assert interests of the third party that are arguably within the zone of interests to be protected. In any event, *jus tertii* considerations only come into play when there is, in effect, a surrogate litigant. Accordingly, while under that doctrine a plaintiff may be granted standing when he asserts interests not of his own but of a third party that meet the zone of interests test, in cases where the plaintiff is acting solely on his own behalf he must demonstrate that the personal interests he is asserting are sufficient to meet the test.

The zone of interests test does not present a difficult barrier for litigants to negotiate insofar as it must only be shown that the asserted interests are *arguably* within the zone of interests to be protected. Federal courts have, properly in my view, treated the requirement liberally. Nevertheless, it has prevented plaintiffs from achieving standing in a few cases. In *Gifford-Hill & Company, Inc. v. FTC,* 173 U.S. App.D.C. 135, 523 F.2d 730 (D.C.Cir.1975), plaintiff brought an action under NEPA seeking nullification of an administrative complaint in which defendant charged plaintiff with antitrust violations by its acquisition of another company. Plaintiff al-

---

**2.** The term *jus tertii* is defined in Black's Law Dictionary as "the right of the third party."

leged that before filing its administrative complaint defendant was required to complete an environmental impact statement wherein the potential undesirable environmental consequences of requiring plaintiff to divest its acquisition should have been evaluated. The court found that although plaintiff satisfied the injury in fact test owing to the necessity of defending in the administrative action and being subjected to the risk of an adverse ruling at the administrative proceedings, there was no demonstration that the injury affected an interest even arguably within the zone of interests to be protected or regulated by NEPA. "NEPA's concern is with protection of the environment, not with the desire of parties to prevent or delay administrative efforts to enforce the antitrust laws." 173 U.S.App.D.C. at 137, 523 F.2d at 732.

Similarly, in *Clinton Community Hospital Corp. v. Southern Maryland Medical Center,* 374 F.Supp. 450 (D.Md.1974), the court held that plaintiff's claim under NEPA for alleged damages resulting from increased competition did not come within the area protected or regulated by the environmental laws. In concluding that plaintiff had no standing under NEPA as a competitor, the court considered it clear that "'the National Environmental Policy Act was not designed to prevent loss of profits, but was intended only to promote governmental awareness of environmental problems.'" *Id.* at 455, *quoting Pizitz, Inc. v. Volpe,* 2 ELR 20378 (M.D.Ala.), *aff'd,* 467 F.2d 208 (5th Cir. 1972).

 Turning to the facts of this case, I am constrained by the principles set forth above to conclude that plaintiffs do not have standing to bring the present action against the utilities or the CFC. Plain-

tiffs have alleged that (1) defendants violated the Atomic Energy Act by executing the sale of 20 percent ownership interest in the Fermi 2 nuclear power plant from Detroit Edison to the two co-ops; (2) the co-ops have been, and will be, forced to borrow sufficient funds for the purchase; (3) in order to finance the interest payments on the loans the co-ops have increased, or intend to increase, the rates their members pay for electrical service; and (4) plaintiffs have thus been injured economically by defendants' unlawful action.[3]

I discussed at length in my previous opinion the intent of Congress in passing the Atomic Energy Act, and concluded that protection of the public health and safety was one of the primary purposes of that legislation. *Drake v. Detroit Edison Co.,* 443 F.Supp. 833, 838 (W.D.Mich.1978). It cannot be said, however, that the Act was designed to protect against the type of economic loss allegedly suffered by plaintiffs. Plaintiffs' detriment, if any, is unrelated to the interests of health and safety with which Congress was concerned in the atomic energy area.[4] In effect, plaintiffs' injury is too far removed from the claimed unlawful actions of defendants to warrant the invocation of judicial relief under the Atomic Energy Act. Thus, while plaintiffs *possess* interests intended to be protected by the Act, they do not *assert* those interests in this case. The interests they do claim to have been injured simply do not arguably fall within the zone of interests to be protected or regulated by the Act.

Even if plaintiffs were alleging injury to their health and safety their complaint would fail. It is axiomatic that it must appear that the alleged wrongdoing proxi-

---

**3.** Plaintiffs have alleged various other injuries as well, including increased taxes, higher unemployment, and "related social problems." These claims do not present sufficient allegations of distinct and palpable personal injuries to satisfy the constitutional standing requirements. At best they represent the type of generalized grievance that "is plainly undifferentiated and 'common to all members of the public'", and that the Supreme Court has held does not provide standing. *See United States*

*v. Richardson,* 418 U.S. 166, 176–77, 94 S.Ct. 2940, 2946, 41 L.Ed.2d 678 (1974).

**4.** Health and safety were not, of course, the only concerns of Congress in passing the Atomic Energy Act. The efficient development of atomic energy was also contemplated. *See Nuclear Data, Inc. v. Atomic Energy Comm'n.,* 344 F.Supp. 719, 725 (N.D.Ill.1972). Plaintiffs obviously do not assert interests related to development of this type.

mately caused plaintiffs' injury. That causative link is absent here. Any interest plaintiffs possess with respect to the public health and safety will be injured by the construction and operation of the nuclear facility, not by the transfer of an ownership interest therein. There has been no attempt to show that the transfer of the 20 percent interest in Fermi 2 to the co-ops has either impaired health and safety or created an imminent threat of such injury. Insofar as the construction of Fermi 2 by Detroit Edison alone was approved by the NRC and is not challenged as unlawful, it is incumbent upon plaintiffs to demonstrate that the addition of the co-ops under the terms of the Participation Agreement creates new or different risks of injury to health or safety. This burden has not been met.

In light of the foregoing, plaintiffs' claims against Detroit Edison and the two co-ops must be dismissed. Their claims against the NRC must also be dismissed, but for different reasons. The gravamen of plaintiffs' complaint against the NRC is that the agency failed to take action against Edison or the co-ops following the transfer of the 20 percent interest in Fermi 2. Judicial review of administrative action—or in this case non-action—is governed by the Administrative Procedure Act (APA), 5 U.S.C. §§ 701, *et seq.* 5 U.S.C. § 701(a)(2) provides that the chapter does not apply to "agency action [that] is committed to agency discretion by law." Regulation 2.202, promulgated under the Atomic Energy Act, states that the appropriate NRC official *"may* institute a proceeding to modify, suspend, or revoke a license or for such other action as may be proper . . ." *See also* 42 U.S.C. § 2236 ("Any license *may* be revoked . . . for failure to observe any of the terms and provisions of this chapter or of any regulation of the Commission.)" (Emphasis added.) Similarly, section 234 of the Act, 42 U.S.C. § 2282, which deals with civil penalties, dictates that the required notice "shall . . . advise such person that upon failure to pay the civil penalty subsequently determined by the Commission, *if any,* the penalty may be collected by civil action." (Emphasis add-

ed.) It is clear that the decision to impose penalties or institute proceedings is committed to agency discretion by law. Indeed, such decisions, whether made by administrative agencies or prosecuting attorneys, have historically been deemed to lie at the very heart of the executive discretionary decision-making process and beyond the scope of judicial review. *Cf. Imbler v. Pachtman,* 424 U.S. 409, 438, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976) (White, J., concurring). Plaintiffs' complaint must, therefore, be dismissed.